I am a counsel for Sitara Bibi and Nazbeen Mohammed, who are mother and child, and Ms. Bibi is present here today in court. If time permits, I would like to reserve time for rebuttal. The issue is well stated, and I will go right into why I believe that the BIA abuses discretion in failing to properly state and consider all the factors in weighing equities and denying relief. In the incident case, the BIA abuses discretion in several significant ways. For asylum based on past persecution, an applicant must show an incident or incidents that rise to the level of persecution on account of a statutorily protected ground, and is committed by government or non-government entities that the government is unwilling or unable to control. When considering the asylum claim, all of these things must be considered cumulatively. And an applicant may suffer persecution because of cumulative effect of several incidents, no one of which rises to the level of persecution by itself. In my brief, I noted several items, and I am going to summarize them now. First was the violent acts. Ethnic Fijians target Indian Fijians in racially motivated acts of violence. Ms. Bibi and her family are Indian Fijians. The BIA cited only two incidents, where she was insulted and rocks were thrown at her, and the forcible expulsion of Ms. Bibi and her family from their home. The BIA failed to consider the other violent acts, including those to Ms. Bibi's husband, Mr. Ayas, who sustained physical injury when he fled their home, when he was beaten and robbed on several occasions between 2000 and 2003, while on the public streets, while going to and from work, and while going to the mosque. Ms. Bibi, Mr. Ayas, and their four-year-old daughter, Nazmin, were all subject to separate stoning incidents in which each of them suffered physical harm, and Nazmin was subject to an attempted kidnapping of her school bus. This court has consistently treated physical harm as persecution, where an applicant like Ms. Bibi suffers such harm on more than one occasion, and is victimized at different times over a period of time, the harm is severe enough that no reasonable fact finder would not be able to find that it did not rise to a level of persecution, particularly where the violent acts are added to the other acts that happened in this case. Another issue was economic harm. I put in my brief that her work hours were cut almost in half. They were actually cut 66%. So the substantial family livelihood was reduced, and the work reduction was systematic and targeted only Indian Fijians. It was a deliberate deprivation that placed Ms. Bibi in a substantial economic disadvantage on account of her race. Third, threats related to the expulsion from the home. The BIA ignored the fact that when they were expelled from their home, it was a default robbery of two items. One, the house itself, and second, all the items contained in the house. The court has held here that threats, especially when considered cumulatively with other factors, constitute past persecution. The next item was a robbery. The BIA failed to consider the robbery, and they failed to consider the threats. The threat was to Ms. Bibi by members of the landlord's family. When she tried to reclaim her house, they threatened her with death. And as far as the robbery, I cited the two items. The government's unwillingness to control native Fijians. Each and every time Ms. Bibi and her family tried to report to the police, the police either declined to take a report, or if they did so, they didn't do anything else. The police conduct in this case is consistent with the 2000 and 2001 State Department country reports in Fiji that note the police's lack of impartiality and at times outright violence towards Indian Fijians. However, the BIA failed to consider that the police were unwilling to help Ms. Bibi and her family. As far as stabilization, because Ms. Bibi and her family were able to reside with a friend after they were forcibly evicted from their home, the BIA assumed stabilization, but they didn't articulate any specific elements in the record that led to its conclusion. To assume stabilization without specific reasoning is an abuse of discretion. Ms. Bibi was forced to seek asylum precisely because the conditions in Fiji are not stable, and her personal circumstances were destabilized since 2000, when she and her family were evicted from their home. Since the BIA did not mention any of these other incidents and factors that I've raised here in its decision, this court cannot assume that the BIA won custody of Ms. Bibi. The BIA did not consider any of them prior to making its decision, and two, even had the BIA consider the cumulative effects of these factors, it did not articulate them in its decision, and the consideration resulted in an incomplete assessment and a distortion of Ms. Bibi's true situation. So do you think the matter should be remanded with instructions that those factors be considered and evaluated? I would believe that would be appropriate, Your Honor, yes. Is that what you recommend? I would recommend that, yes. And as far as the well-founded fear of persecution, even though the BIA said that she, excuse me, as far as the well-founded fear of persecution, the BIA assumed that Ms. Bibi met the subjective standard because they addressed the issue. The BIA appears to have considered that the harm to Ms. Bibi was no more and no different from the harm to Ms. Bibi. However, this court has held that in the context of Indian-Fijian asylum cases, as well as others, that where the petitioner establishes that many members of her group were targeted for persecution, less of an individualized showing is required than more. Were Ms. Bibi and Nazmin forced to return to Fiji, they would face the same danger and violence confronting Mr. Ayas today. However, the BIA disregarded the violence to Mr. Ayas, and instead of addressing the issue specifically, they merely addressed the general reference of the evidence in the record and concluded that Ms. Bibi did not meet the objective standard. Such cursory treatment of the record runs contrary to this case's court law. Moreover, the BIA did not specifically address that it would be unreasonable to expect Ms. Bibi to relocate to Fiji. Returning to Fiji would be unreasonable, given the limited options that she has in relocating within a very small island. Ms. Bibi and Nazmin are entitled to a presumption that they would be persecuted in the future, and because she has shown that she continued to face significant problems after the coup, even after general conditions improved substantially, any reasonable fact finder would find that the country conditions in Fiji were not satisfactory. However, I also agree with her on the issue of whether or not the petitioner had appropriately turned to the police, and whether or not he was subjected to a level of past persecution, as well as making other findings as to whether or not the petitioner had appropriately turned to the police and other types of findings there. The main conclusion there is that he looked at those facts, all of those facts, and found that they did not rise to the level of past persecution. So then we have a couple of precedents, and I think we have to probably analyze the facts of this case, which we now have flushed out, I imagine, to some extent, and how they fit within the precedent that we have to abide by. So we have Shand, and we have Sarita, we have Prosad. Those are the three cases. Are there any others out there that we should reflect upon, and how do you think that the facts of this case play out in respect to these prior precedents? Well, first of all, I would say, as was indicated in my brief, that there are numerous cases on the asylum claims of Indo-Fijians. And the government believes that, in this particular case, that the facts of this case hew closer to cases in which the court has denied asylum than in which they have found that the petitioners have demonstrated past persecution. For example, in Singh v. the INS, the petitioner had asserted that she was the only Indo-Fijian in her village, that her house was stoned every night by native Fijians, and ethnic Fijians loitered in her yard, and she was burglarized, similar to the petitioner, and that she feared for her life because a daughter's friend had been attacked, but the court still found that that did not rise to the level of persecution. Do you have any case where somebody was actually evicted from their home and not permitted to return, where the past persecution was not found? Well, I would refer the court to the fact that this court has generally found that economic persecution in and of itself is not persecution. Well, how do you deal with Sarita, then? I mean, Sarita, we looked at the fact that they had been evicted from the home in Fiji as a significant factor in determining that there had been past persecution. Well, first of all, Sarita, there were other factors in that decision. I mean, certainly they were evicted from their home, but the petitioner there was repeatedly logged. Hold on, hold on. You're shifting the question. Your answer to Judge Block was, no, economic harm doesn't count. His question was, are there cases in which someone has been evicted from their home in which there had been a sustained finding that this wasn't persecution? Your answer was economic harm is not past persecution. So I ask you about Sarita, where we credited the fact that they've been evicted from the home as a factor. And then you said there are other factors. The question is, is eviction from home constitute persecution under the Immigration and Naturalization Act? Sarita would seem to imply yes. What's your answer? I would state that Sarita only puts the eviction from the home as a single factor in a number of factors in which they found that cumulatively it rose to the level of past persecution. So it has to count at least as a factor. Would you agree that it has to count at least as a factor? That they were evicted from their home? Yes. It's certainly an event that they allege, but it shouldn't be the determinative fact here. You say it's an event that they allege, but isn't this something which we can establish as factually correct? Yes, because when I say allege, I mean that the immigration judge found this as a fact and that they were evicted from their home. But I would direct the court to... After reading Sarita, why do you think that there is no legal significance to the fact that they were evicted from their home and they couldn't return? There are two reasons because of that. First of all, all of the events that they allege, almost all of the events in which they allege persecution happened between maybe May 19th and May 20th of 2000, in which was the days of the coup in Fiji, in which there was a general condition of civil strife in the country. So in that respect, generally the court has rejected asylum claims made based on general civil strife. Second of all, I would say also again... Subsequent to that, her husband remained and he was the victim of several assaults, robberies. He reported the incidents. The police either refused to accept the reports or took no action. That was subsequent to the coup. Well, first of all, in terms of her husband's claims, most of her husband's claims occur after she left Fiji to the United States. So they would go towards whether or not she had a well-founded claim of future persecution. And also I would state that most of his claims are not clear that he was attacked because he was an Indo-Fijian. They simply state he was robbed and he was attacked. If you look at the letters and if you look at her testimony, nowhere there does she state that any of his attackers made any type of claim that they were attacking him because he was Indo-Fijian. But to get back to Judge Thomas' point, the concept of economic persecution in which an eviction from the home would go, would be constituted under that rubric... The husband was beaten during the eviction preceding the husband was beaten. He fled to the jungle. That's not pure economic practice. Her actual testimony was that he was attacked during that time, but he certainly didn't need any medical treatment. She simply said they had a couple of marks on his face at the time. The reason that I would state that losing one's home is viewed as economic persecution here is that the definition of persecution is an extreme concept. It is attached to the loss of life and liberty and freedom. Here, the petitioners clearly were able to find shelter pretty much the next day and have been able to... There was loss of life, liberty, and freedom. What happened to property? In terms of the definition, but property exactly would be under my rubric of why the loss of a home would be considered economic persecution. I mean, loss of life, liberty, and freedom. Liberty and freedom usually have three things, but it wasn't life, liberty, and freedom. It was life, liberty, and property were the three things that we were usually concerned about losing. Why can't loss of property, even if there's some kind of an economic motive, be based on race or ethnicity or religion? For example, even if you had people who were economic refugees who were taking property from others, if they are systematically taking it from endophagians, that would mean that they were both an economic motive and a ground of persecution recognized by the asylum laws. Persecution, again, is suffering and harm. If one cannot prove that property damage or loss of property is not suffering and harm, then it does not rise to the level of persecution. Wait, loss of one's home and one's possessions is not a loss that's cognizable under our laws? Well, as Your Honor defined a home a minute ago, a home is property. And this court has specifically made clear that even under serious threats, harassment, and property damage all considered together, that that wouldn't be sufficient to rise to the level of persecution. I think we're talking about vandalism sometimes. I mean, occasionally, if you've got your car vandalized, we talk about property loss maybe not being specific, but I don't think we've ever held that when somebody has been forcibly evicted from a home with violence, that that doesn't constitute persecution. Counsel, there are times when somebody says, I'm a victim, I'm entitled to asylum because my home was burglarized. You say, well, burglary, that is ordinary crime. And just because things are bad in your country and we've got lots of burglars running around, doesn't mean that you've been persecuted on account of your race or ethnicity or political views. But if somebody were to say, the homes of Indo-Fijians, one, are systematically burglarized, and two, the police refuse to do anything about Indo-Fijians, that is a pretty classic case of persecution on account of race or ethnicity. But I would distinguish that from the facts in this particular case. Here, again, they were evicted from their home during a very specific time period. Second of all, as we said in our brief, it's not particularly overly clear that their ultimate eviction from the home possibly was based on their Indo-Fijian status. May I stop you there? Where does it say in the BIA opinion that there's some temporal limitation on what happens to people's homes? Now, when I read the BIA opinion, they said, this just doesn't map to persecution. You're putting a temporal gloss on it, but you have to defend the agency decision. And I didn't see that it was founded in any temporal limitation. Well, the agency essentially said that the loss of their home didn't rise to the level of persecution. So to the extent that this is defining that it did not rise to the level of persecution, we're still defending the board's decision as stated. The board's decision in this case affirmed the immigration judge's decision. And as I stated, the board does not always go into every single detail of the immigration judge's decision. But the immigration judge specifically made the factual finding. But in this case, they didn't make a Bourbonno Affirmance. They gave their own reasons. So don't we just look at the BIA decision? Well, I'm sorry. Let me define that a little bit further. In terms of we look to the board's decision for its determination, but we look to the immigration judge's factual findings for the support for its decision. And here, the immigration judge's factual findings clearly state all of the allegations that were made by the respondent in their brief. I take your point. Because we're a little bit over time, let me move to one other issue I wanted to discuss with you before I sit down. The BIA said, the respondent has failed to produce any evidence from which we can conclude that ethnic Indians are persecuted in Fiji. Now, we have all this case law that describes in great detail that, in fact, ethnic Indians are persecuted in Fiji. What are we to make of this conclusion by the BIA? It's just not accurate. We look at the country reports. We look at the evidence we've had. I just don't know where they came up with that conclusion. Well, I believe that you quoted that section of the sentence without acknowledging the first part of it, where they say, while the evidence in the record suggests that ethnic Indians discriminate against, harass, and insecure land tenure. I did think it was particularly relevant because we're talking about persecution. We have all these cases in which we found, as a matter of law, there's persecution. And there's a sweeping statement. If you accept it as true, then no ethnic Indians could ever get relief under the Immigration and Naturalization Act, right? This statement is so broad, it is not directed to the evidence in this case. It says that the evidence in this case suggests that ethnic Indians didn't say the Bibis are discriminated against. There's no evidence. We have failed to produce any evidence. Where has the BIA been for the last couple of years? I mean, this just flies in the face of all of our decisions. It does overstate things just a little bit, doesn't it, counsel? But the board is specifically addressing this case to the extent that its language is a statement. If the board is correct, there is no evidence from which the board can conclude that ethnic Indians are persecuted in Fiji. We have been in error in a number of cases. Well, they stated the respondent has not produced any evidence. I mean, there's a distinction there. And again, in the beginning of the sentence, which Your Honor eliminated in your first quote of that particular sentence, they're specifically stating there's evidence of harassment, there's evidence of insecure land tenure and discrimination. But none of these things rise to the level of persecution. And that's the point that the board is making here. The board is not making an overbroad statement that no Indo-Fijians can show persecution. Well, that's basically what the board said. I would disagree with Your Honor's reading of that particular statement. I think it's very specific to this case, which, as most immigration law states, each case must be looked on its merits alone. If the respondents had come up with a handful of our decisions related to Indo-Fijians, would the board then have had to concede that there was evidence that ethnic Indians are persecuted in Fiji? Is that all we had to come up with, was just a couple of cases? I'm sorry, I misunderstood the question. If this media had come forward with a handful of our decisions on Fiji, would that have satisfied the board that there was some evidence from which they could conclude that ethnic Indians are persecuted in Fiji? Couldn't the BIA have taken judicial notice of our decisions on Fiji? Well, again, what the board is specifically analyzing here is only the evidence that the petitioner submitted here. And they're stating that on this evidence we cannot find that it rises to the level of persecution, that there's a well-founded fear of future persecution. I think what Your Honors are misunderstanding is that they're not stating that there's no case in which this can be said, despite the language there that you're reading. Well, you do think that the language maybe overstates things just a little bit. I think that you're reading it as more expansive than it's meant to be. The board's language is meant to be specific to this case, and I think that the language, the respondent has not produced any evidence, and its modifier, while evidence in the record suggests this. That's what I don't understand. It talks about this group as a whole, yet during the same time period we know we have all these other cases. The BIA has all these other cases in which a successful case was made about persecution. There's really no doubt about it. I mean, it's just the country reports, everything else from this period of time. The politics of Fiji are complicated. We've had regime change, counter-regime change, and so forth, but we have all these cases from Fiji, so I don't understand the board's conclusion that there's just nothing going on there. Well, as Your Honor pointed out earlier, there are both positive and negative cases in your circuit in and of itself, in which Indo-Fijians, looking at the merits of each of their individual cases alone, that some have shown that their individual case has rose to the level of persecution, others have not. As we stated in the government's brief... So you take Cerrito, which says eviction plus some extortion attempts is sufficient, and here we have eviction plus rock throwing and some other harassment and a beating. It's hard to see the difference in the cases. Well, in Cerrito, again, they were talking about repeated incidents of robbery, that her home was specifically invaded by the Fijian military. This wasn't a random act of civil strife in which some looters or robbers came into their home for indeterminate causes during a coup. That was specific to the ethnic Fijian military, in which they invaded their home with armed guns and knives. That certainly was not the case here. Here, during the exact day of the coup, the petitioners were unfortunately, but not in a way that rised the level of persecution, were displaced by civil strife, and they were displaced in... So after they were displaced, were they welcomed back into the property and said after the coup, I'm sorry, that was a random act of violence, you can have your property back, or what happened? The government said you can't have your home back. Not the government. Their landowner stated, in their testimony, they stated the landowner said that his grandson was living at the house. They moved him into the house with all of their furniture, and they went to the police and asked for help, and the police declined to help them. No, I believe the statement, they went to, I would like to clarify that actually. If you look at the record on page 172, they state the day, the next day after the coup, during which there was still an enormous amount of civil strife, so the coup occurred on May 19, 2000, on that night they were evicted. They stated the next day they tried to file a police report, but the police refused. Her testimony was that at that time, they said they won't take any report because there was a lot of agitation going on. I mean, certainly, during a time in which the record does state that there was looting, there was numerous other types of actions going on, that the police didn't have time to take a report. So where is that in the record? Where is that in the record, the police said they didn't have time to take the report? It's during her testimony on page 172. And also, I'd like to state that the letter from Mr. Khan, who they stayed with, which I may add was only five miles away from their home, after they were allegedly persecuted during that time, the letter from Mr. Khan specifically states on page 375, there were numbers of robberies and looting were done in the Indo-Fijian areas. This was a time of enormous civil strife in the country, and you can't say that because of a single incident, two incidents over two days in which that happened, that that rises to the level of persecution in this particular case. Thank you, counsel. Thank you. Member Bunnell. Thank you, Your Honor. In my former life, I was an INS trial attorney, too. In this case, my client's case is more similar to Sarita and Chand. And because if a person's house was repeatedly robbed and then she was displaced from her home and threatened, and there was no physical harm, that amounted to persecution. In Sarita, that should amount to persecution in this case. I guess the difference is that in Sarita, you actually had soldiers looting the home. Well, in this case, they didn't know who the people were. They were armed men, six of them running into their house. They didn't want to wait to find out who these people were. And then when they went to the police station, that's true, the next day the police didn't want to take a report. But three months, for three months, she kept on going back, trying to get her house. The landlord refused. He put people in there. And every time she came back, nothing happened. The only thing she ever got out of there was her purse. Everything else remained. And you are correct. The landlord put his grandson in there. And every time they asked the police to come help them, even just to get their own possessions, they said no. That wasn't just on one occasion. That was every occasion. I read this as the fact that she did not file a police report because she had no proof that she owned the home. I'm confused about that. I was not the trial attorney. Excuse me. I was not the attorney representing her before the IJ. I don't know either. But that's what the record shows. From what I understood, perhaps it was another friend that had the lease and she was on the property. I understood Judge Block's question to be where is it in the record that she went back to the police on more than one occasion. I don't have the brief in front of me. I don't have the transcript in front of me, but I did state in my brief, and it was in the occasions where she was threatened with harm, that she did go back and I cited the record. And it was in the record at page 173 for the second record, and the first record, it was on page 149. So that was all in that same, and then for the next three months she tried to go back, and that's on the record also, the first record at 149, the second record at 176. Is there anything that says that she tried to go to the police again? On page 148 and 149 of the first record, and page 172 of the second record. What does it say? And then as far as the, she did not report the other incidents when she went back and the landlord refused to let her back in. She didn't report those because she had no documentation to verify her ownership. That's correct. She did not own the land. I'm sorry, read the record. She owned the house. The grandson told Bibi that he would kill her if he ever saw her again. That's in the record, right? My understanding is that's true. Page 153 in the first record and page 177 on the second record. Mr. Ciasaki's grandson threatened Ms. Bibi saying that he would kill her if he ever saw her again. Okay. Thank you, Your Honors. Thank you very much. The case is here to be submitted for decision.
judges: Thomas, Bybee, Block